## COMMONWEALTH *vs.* SPENCER JULIEN.

No. 02-P-444.

Suffolk. May 15, 2003. - October 17, 2003.

Present: GRASSO, McHUGH, & MILLS, JJ.

*Evidence,* Expert opinion, Prior misconduct, Hearsay. *Witness,* Expert. *Burning a Dwelling House. Stalking. Practice, Criminal,* Instructions to jury, Reasonable doubt.

At a trial on charges of arson under G. L. c. 266, § 1, a Superior Court judge correctly denied a motion to strike expert testimony where the defendant failed to challenge the foundation of the expert's opinion before the expert testified, and where the admission of the testimony, even if error, did not create a substantial risk of a miscarriage of justice [683]; moreover, the judge correctly denied the defendant's motion for a required finding of not guilty as to arson, where the evidence was sufficient to support the defendant's conviction of that charge [684].

The evidence at a criminal trial was sufficient to convict the defendant of stalking under G. L. c. 265, § 43(*a*), as amended by St. 1996, c. 298, § 11, where the victim testified that the defendant forcibly entered her apartment, causing her to be fearful and hitting her in the chest with the door; told her he was going to kill her and her daughter; called her later and said he "should burn the house down"; and kept calling her on the day he burned her house down, even though she only spoke to him once [684-685]; further, the lack of a specific unanimity instruction as to the predicate incidents supporting the stalking charge neither was erroneous nor created a substantial risk of a miscarriage of justice, where the defendant did not request such an instruction, where there was evidence of separate incidents, more than two of which had to be proved to sustain the stalking conviction, and where the jury could have found the essential elements of stalking beyond a reasonable doubt [685-686].

At a trial on charges of arson, stalking, threats, and assault with intent to commit murder, a Superior Court judge correctly allowed the victim to testify about the defendant's prior abusive behavior toward her, where such testimony was relevant to show the hostile nature of the relationship between the defendant and the victim, as well as the defendant's state of mind and motive to commit the charged crimes against the victim and her children, especially where the judge carefully instructed the jury that such evidence was not to demonstrate the defendant's propensity to commit the alleged crimes. [686-687]

At a criminal trial, the admission in evidence of two statements by the victim, and a statement by the victim's brother, even if error, did not, in light of

other evidence, create a substantial risk of a miscarriage of justice, where trial counsel failed to object to the admission of two statements on hearsay grounds and withdrew an objection to another statement [687-688]; likewise, the admission in evidence of the victim's testimony regarding statements the defendant made to her was not error, because the statements were admissible as admissions of a party opponent, and because it was within the judge's discretion to determine whether the prejudicial effect of the statements outweighed their probative value [688].

At a criminal trial, a Superior Court judge's instructions did not trivialize, or in any way diminish, the government's burden to prove the crimes charged beyond a reasonable doubt; moreover, the judge's comments on the evidence did not demonstrate a pro-prosecution tone, where any possible appearance of partiality was negated by the judge's final instructions, and any error did not give rise to a substantial risk of a miscarriage of justice in light of the general weight of the evidence against the defendant. [688-690]

INDICTMENTS found and returned in the Superior Court Department on September 29, 1999.

The cases were tried before *James D. McDaniel, Jr.*, J.

*Joseph S. Berman* for the defendant.

*Amanda L. Lovell*, Assistant District Attorney, for the Commonwealth.

MILLS, J. After a jury trial, the defendant was found guilty of arson, G. L. c. 266, § 1; stalking, G. L. c. 265, § 43(*a*); threats, G. L. c. 275, § 2; and thirteen counts[1] of assault with intent to commit murder, G. L. c. 265, § 15. On appeal, he claims the judge erred in (1) denying a motion to strike the arson expert's testimony; (2) denying a motion for a required finding of not guilty on the arson charge; (3) denying a similar motion on the stalking charge; (4) failing to give a specific unanimity instruction on the stalking charge; (5) admitting prior bad act testimony; (6) admitting various hearsay statements; and (7) making improper comments in final instructions. We affirm.

*Factual background.* While on routine patrol in the early hours of March 15, 1999, Boston police Officers Richard Fitzpatrick and Joseph Tse observed a small fire on the front porch of a residential property at 347 Bowdoin Street in the Dorches-

---

[1]The Commonwealth proceeded on a theory that the alleged arson constituted an assault with intent to commit murder on the defendant's girlfriend and, on a theory of transferred intent, on twelve other people living in the same property.

ter neighborhood of Boston (the property). They observed a black male with a black knit cap, three-quarter length olive jacket, and black pants walking out of the property. After the officers yelled, the individual fled and the officers were unable to catch him.

At trial, Officer Fitzpatrick testified that a resident of the property, Robin Peebles, who lived there with her three children, identified her boyfriend, the defendant, as having started the fire.[2] Peebles herself testified, without objection, that she was first alerted to the fire on being awakened by her brother's screaming, "Spencer done burnt the house," and that after speaking with the police, she called her friend, Robin Nichols, and told her that "Spencer had burnt the house."

Peebles also testified about several incidents involving threatening and violent behavior by the defendant toward her[3] as follows: (1) in November, 1994, the defendant "smacked" a bottle in her teeth, breaking two of them; (2) the defendant beat her on her legs and stomach with a baseball bat a couple of weeks before the birth of her son on June 1, 1996; (3) on August 11, 1996, wearing boots, the defendant kicked her in the vagina, resulting in her hospitalization for a week and requiring two surgeries; (4) approximately one month later, the defendant, wearing the same boots, kicked her in the forehead, causing a gash and a subsequent scar; (5) on or about December 6, 1997, while she was visiting a friend, the defendant grabbed Peebles, threw her on a couch, and cut her on the neck and shoulder

---

[2]The defendant initially objected to this testimony but then withdrew his objection on the prosecutor's proffer that the defendant "had been by the house, that he had threatened [Peebles] and the children on Saturday night, and [the testimony would] get into those parts of the stalking, as well as the threats."

[3]The defendant objected to this testimony. The trial judge overruled the objections, instructing the jury that the evidence was limited to demonstrating the relationship between Peebles and the defendant, motive, and intent, and not the defendant's propensity to commit the crimes charged. During final instructions, the judge stated that evidence of the defendant's prior misconduct could not be considered "for the purpose of showing his bad character or propensity to commit the crime or crimes for which he is being tried. However, such evidence, as I said earlier, may be offered at trial for [the] very limited purpose . . . of the jury's consideration on the issues of the defendant's state of mind, intent, pattern of conduct, and motive with respect to the circumstances of the crimes charged."

with a razor; and (6) approximately one week later, the defendant again cut her, this time on her arm.

Peebles testified that, on Saturday, March 13, 1999, the night before the fire, the defendant pushed in through the back door of her apartment, hitting her in the chest with the door as he did so, and told her he was going to kill her and her daughter, Nikita. She was afraid of the defendant. Sometime after he left her apartment, the defendant called her and said "he should burn the house down."[4] Peebles further testified that the defendant called her several times that night and during the next day, and the day after the fire, the defendant called her and admitted that "he set the house on fire but he didn't mean to hurt [her]."

Robin Nichols, a friend with whom the defendant stayed before the fire, testified that, while the defendant was staying with her, she noticed a bag with a can of lighter fluid in her bedroom; that the defendant was elusive when asked about the lighter fluid; that he left her apartment on the night of the fire wearing her own brown coat and a black knit cap; and that the can of lighter fluid was gone the night of the fire.

Captain Robert Staunton, an investigator with the Boston fire department arson squad, testified that he went to the property at approximately 12:45 A.M. on March 15, 1999, and, upon entry, saw "a burn in the bottom right hand corner of the hallway on the floor," and noticed an aroma that "smelled like lighter fluid." Staunton testified that he investigated approximately one hundred fires a year and had investigated between twenty and thirty fires in which lighter fluid was the suspected accelerant. He noted the burn pattern on the floor was "like someone had squirted and lit." He saw a single burnt cardboard match on the floor by the threshold. He opined that the fire was incendiary, set on purpose with a flammable liquid. No contemporaneous objection was made. The day after Staunton testified, at the conclusion of the Commonwealth's case, the defendant's motions to strike Staunton's testimony and for required findings of not guilty on the arson and stalking charges were denied.

The judge instructed the jury that their verdict must be

---

[4]The defendant made no objection to this testimony.

unanimous. The defendant did not request a specific unanimity instruction as to the predicate incidents supporting the stalking charge, and no timely objection was made to the judge's general unanimity instruction.

*Discussion.* 1. *Motion to strike expert testimony.* Citing *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), the defendant argues that the judge erred in denying the motion to strike Captain Staunton's testimony because the testimony lacked an adequate foundation and any empirical basis. "Generally, a challenge to the foundation of [an] expert's opinion must be made before an expert testifies." *Commonwealth* v. *Hill*, 54 Mass. App. Ct. 690, 697 (2002), citing *Commonwealth* v. *Beausoleil*, 397 Mass. 206, 220-221 (1986). See *Commonwealth* v. *Sparks*, 433 Mass. 654, 659 (2001) (to preserve objection based on scientific unreliability, a party must file an appropriate pretrial motion stating the grounds for the objections and request a hearing in accordance with the principles set forth in *Canavan's Case*, 432 Mass. 304, 309-312 [2000], and *Commonwealth* v. *Lanigan*, 419 Mass. at 24-27). No such challenge was made, and the defendant cannot preserve the error by means of a subsequent motion to strike. "The rule generally prevailing in this Commonwealth is that objections to matters of evidence must be seasonably made . . . and a party cannot of right insist upon saving an exception to evidence by thereafter seeking to have the evidence struck out." *Commonwealth* v. *Baptiste*, 372 Mass. 700, 706 (1977), quoting from *Commonwealth* v. *Theberge*, 330 Mass. 520, 527 (1953). Absent a timely objection, we review to determine whether the admission of Staunton's testimony, if error, created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Perkins*, 39 Mass. App. Ct. 577, 584 (1995).

Certainly, the judge could take into account the lack of seasonable objection to Staunton's testimony in considering the motion to strike. The judge did not abuse his discretion in denying the motion. And, for the reasons discussed *infra* concerning the sufficiency of the evidence as to arson, the admission of the testimony, even if error, did not create a substantial risk of a miscarriage of justice.

2. *Sufficiency of the evidence as to arson.* The defendant further argues that the evidence was insufficient to support the arson conviction. We consider the evidence in the light most favorable to the Commonwealth and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).

To prove arson, the Commonwealth was not required to establish that an accelerant was used. Under G. L. c. 266, § 1, the elements of arson are "first, that the defendant wilfully and maliciously, second, burned or caused to be burned or aided, counseled or procured, third, the burning, and fourth, of a dwelling house." *Commonwealth* v. *Niziolek*, 380 Mass. 513, 526 (1980). Even absent Staunton's testimony, the evidence that the defendant had set the fire was strong. The night before the fire started, the defendant had told Peebles that he should burn the house. Lighter fluid stored by him at Robin Nichols's apartment before the fire was gone after the fire. The defendant left Nichols's apartment shortly before the fire began and was dressed similarly to the man Officers Fitzpatrick and Tse saw running from the fire. The defendant admitted to Peebles that he had set the fire. The motion for a required finding of not guilty as to arson was properly denied.

3. *Sufficiency of the evidence as to stalking.* The elements of stalking as set out in G. L. c. 265, § 43(*a*), as amended by St. 1996, c. 298, § 11, consist of "(1) willfully and maliciously engag[ing] in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) mak[ing] a threat with the intent to place the person in imminent fear of death or bodily injury."[5] More than two incidents are required to satisfy the first element. *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543, 547-548 (1994). *Commonwealth* v.

---

[5]General Laws c. 265, § 43(*a*), inserted by St. 1997, c. 238, § 1, specifically provides that "[s]uch conduct, acts or threats . . . shall include . . . conduct, acts or threats conducted . . . by use of a telephonic or telecommunications device."

*Martinez,* 43 Mass. App. Ct. 408, 411 (1997). Under the second element, the prosecution need only prove that "the defendant made *a* threat with the intent to place the victim in imminent fear of death or bodily injury" (emphasis supplied). *Commonwealth* v. *Matsos,* 421 Mass. 391, 394 (1995). "This element closely approximates the common law definition of the crime of assault." *Ibid.*

The indictment specified that the stalking took place "during February, 1999 through September, 1999." Peebles testified that (1) on March 13, 1999, the night before the fire, the defendant caused her to be fearful when he forcibly entered her apartment, hitting her in the chest with the door as he did so; (2) he told her he was going to kill her and her daughter; (3) later that evening, after he left, he called her and said "he should burn the house down"; and (4) on the day of the fire, he kept calling her, although she only spoke to him once. Further, as discussed above, the evidence was sufficient for a finding that the defendant committed arson on the night of March 14, 1999, by burning Peebles's home. Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found, beyond a reasonable doubt, the first element of stalking in the March 13 forced entry into Peebles's apartment, the arson on the evening of March 14, and the intervening phone calls, and the second element in the defendant's assertion, on forcibly entering Peebles's apartment, that he was going to kill Peebles and her daughter. See *Commonwealth* v. *Latimore,* 378 Mass. at 677.

4. *Specific unanimity instruction.* The defendant further argues that the judge erred in failing to give a specific unanimity instruction sua sponte as to the predicate incidents supporting the stalking charge. If a defendant requests a specific unanimity instruction, and "where evidence of separate incidents is offered to the jury and *any one* incident could support a conviction, a general unanimity instruction *may not* suffice to ensure that the jury actually does reach a unanimous verdict" (emphasis supplied). *Commonwealth* v. *Pimental,* 54 Mass. App. Ct. 325, 329-330 n.4 (2002), quoting from *Commonwealth* v. *Conefrey,* 420 Mass. 508, 513 (1995). Here, however, the defendant did not request a specific unanimity instruction, and there was

evidence of separate incidents, more than two of which had to be proved to sustain the stalking conviction.

We are not aware of any Massachusetts case addressing the need for a specific unanimity instruction in these circumstances. However, when a defendant does not request a specific unanimity instruction or timely object to its absence, "no substantial risk of a miscarriage of justice" exists where "the evidence satisfies each element of the statute and is sufficient to defeat a motion for a required finding of not guilty." *Commonwealth* v. *Keevan*, 400 Mass. 557, 567 (1987).

As no specific unanimity instruction was requested, and in light of our conclusion that the jury could have found the essential elements of stalking beyond a reasonable doubt, the judge's failure to give a specific unanimity instruction sua sponte, even if error, created no substantial risk of a miscarriage of justice.

5. *Admission of prior bad acts evidence.* During the trial, over the defendant's objection, Peebles testified about the defendant's prior abusive behavior toward her. The defendant argues that this testimony was prejudicial and irrelevant to any issue in dispute.

"Evidence of prior bad acts is not admissible to show that the defendant has a criminal propensity or is of bad character." *Commonwealth* v. *Marrero*, 427 Mass. 65, 67 (1998), quoting from *Commonwealth* v. *Robertson*, 408 Mass. 747, 750 (1990). However, "[i]t is well settled that the prosecution may introduce evidence of a defendant's prior bad acts, if relevant, to show a common scheme or course of conduct, a pattern of operation, absence of accident or mistake, intent, or motive." *Commonwealth* v. *Roche*, 44 Mass. App. Ct. 372, 380 (1998), citing *Commonwealth* v. *Mamay*, 407 Mass. 412, 417 (1990).

Evidence of the defendant's prior assaultive behavior was relevant to show the hostile nature of the relationship between the defendant and Peebles. See *Commonwealth* v. *Bianchi*, 435 Mass. 316, 322 (2001). It was further relevant to the defendant's state of mind and motive to commit the charged crimes against Peebles and the children. See *ibid.*

In holding that the evidence was properly admitted, we also note that the judge adequately guarded against any potentially

prejudicial effect by carefully instructing the jury, when the testimony was admitted, and again during the final charge, that the evidence was limited to demonstrate the relationship between Peebles and the defendant, motive, and intent, and not the defendant's propensity to commit the alleged crimes.

6. *Hearsay testimony.* (a) *Peebles's statements.* At trial, Officer Fitzpatrick testified that Peebles identified the defendant as having set the fire. Peebles herself also testified that, after the fire had been extinguished and the police had left her apartment, she called her friend, Robin Nichols, with whom the defendant was staying at the time, see *supra* at 681, and told her that "Spencer had burnt the house."

The defendant now claims error in the admission of both statements on hearsay grounds. Peebles's statement to Officer Fitzpatrick identifying the defendant as having set the fire involves a closer question as to the applicability of the excited utterance exception to the hearsay rule than does her later statement to Nichols. For the purposes of this appeal, however, we need not determine that question. Although the defendant initially objected to Peebles's statement to Fitzpatrick, the objection was subsequently withdrawn, and no objection was made to her statement to Nichols. Even if hearsay, "[a]bsent objection, the hearsay testimony was properly admitted, and the jurors were entitled to give it such probative effect as they deemed appropriate." *Commonwealth* v. *Paniaqua*, 413 Mass. 796, 803 (1992), quoting from *Abraham* v. *Woburn*, 383 Mass. 724, 726 n.1 (1981). See *Commonwealth* v. *Pimental*, 54 Mass. App. Ct. at 330 n.5.

The defense theory, at least in substantial part, was that Peebles had a vendetta against the defendant.[6] "We will not

---

[6]During opening statements, defense counsel summed up as follows: "In the end when the government completes its case they will assert through the same lay witness, it will all go back to this one person, well, we don't have the forensic evidence, we don't have the science . . . we don't have the police reports, but she said he did it." At the start of his closing argument, defense counsel stated, "I told you at the opening it's not going to be about the charges, it's going to be about the vendetta." Later, he returned to the same theory, stating, "Let's talk about this case. No forensic, no police report, no investigation. Okay. We have Robin said he did it. . . . That's what you're left with."

second-guess the defendant's trial strategy," *Commonwealth* v. *Harbin,* 435 Mass. 654, 659 (2002), and in light of the other evidence that the defendant had set the fire, discussed *supra,* we conclude that the admission of Peebles's statements, even if error, did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Morgan,* 422 Mass. 373, 379 (1996); *Commonwealth* v. *Ivy,* 55 Mass. App. Ct. 851, 856 n.5 (2002).

(b) *Peebles's brother's statement.* The defendant also claims error, on hearsay grounds, in the admission of Peebles's testimony that, on the night of the fire, she was awakened by her brother screaming, "Spencer done burnt the house." The defendant did not object to this testimony, and for the reasons discussed *supra,* there was no error, and even if so, there was no substantial risk of a miscarriage of justice.

(c) *Defendant's statements to Peebles.* As previously noted, Peebles testified that on the night before the fire, the defendant called her and said that "he should burn the house down," and the day after the fire, he called and admitted having done so. The defendant now argues that both statements were admitted in error because their prejudicial effect outweighed any probative value.[7]

"Any extra-judicial statement by a party may be admitted in evidence against that party by an opponent, and will not be excluded on the ground it constitutes hearsay." *Commonwealth* v. *Marshall,* 434 Mass. 358, 365 (2001), quoting from Liacos, Brodin, & Avery, Massachusetts Evidence § 8.8.1, at 496 (7th ed. 1999). Both statements were admissible as admissions of a party opponent. The determination whether the prejudicial effect of a statement outweighs its probative value "rests in the sound discretion of the judge and will be upheld absent palpable error." *Commonwealth* v. *Pike,* 430 Mass. 317, 325 (1999). There was no error.

7. *Jury instructions.* Finally, the defendant argues that the

---

[7]Again, the defendant offered no objection to either statement, and error in the admission of the statements, if any, is evaluated to determine whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Morgan,* 422 Mass. at 379; *Commonwealth* v. *Ivy,* 55 Mass. App. Ct. at 856 n.5.

judge erred by (1) embellishing the *Webster*[8] charge, apologizing for its language, and detracting from its gravity in such a manner as might have caused the jury to trivialize the government's burden to prove the crimes charged beyond a reasonable doubt,[9] and (2) improperly commenting on the evidence.

We disagree. The judge's words could not have been taken by reasonable jurors to trivialize, or in any way diminish, the government's burden to prove the crimes charged beyond a reasonable doubt. To the contrary, taken in their true context, the judge's words actually emphasized the importance of the charge. While different language would have been preferable, the judge noted that, in the past, jurors had described the charge to him as "mumbo-jumbo." He was explaining to the jury why he was obliged to use the particular language mandated by *Webster*. In *Commonwealth* v. *Dupree*, 22 Mass. App. Ct. 945 (1986), we noted that the judge's own description of the language of the *Webster* charge as "silly" "trivialize[d] the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt" and could have suggested that they need not take the *Webster* language seriously. *Id.* at 946, quoting from *Commonwealth* v. *Ferreira*, 373 Mass. 116, 129 (1977).

The defendant's argument that the judge's comments on the

---

[8]*Commonwealth* v. *Webster*, 5 Cush. 295, 300 (1850).

[9]Instructing the jury, the judge introduced the charges, commenting that this was "not a complicated case." And instructing as to the Commonwealth's burden of proof beyond a reasonable doubt, the judge stated the following: "Now the first thing I want to let you know is this: This definition that I'm about to give you may be somewhat archaic, difficult to understand. Jurors often send me out a note and they say 'Judge, I mean what is all that mumbo-jumbo? I mean could you break it down to everyday ordinary English so we could understand it . . . ?' And of course I have to say no, because this definition came down to us from a decision *Commonwealth* v. *Webster*, in 1850, and reasonable doubt has been defined based on that case ever since that time. So I'm not permitted to break it down into ordinary English. What I tell you is what I must tell you. To the extent that you want to hear it later on, I will make certain that you have that available to you and you can hear it as long as you want to, but this is the definition that you must go by, as I am bound by it as well." The defendant objected.

evidence demonstrated a pro-prosecution tone also lacks merit.[10] Any possible appearance of partiality was negated by the judge's final instructions.[11] And certainly, in light of the general weight of the evidence against the defendant and the judge's instructions concerning impartiality, any error did not give rise to a substantial risk of a miscarriage of justice.

The judgments are affirmed.

*So ordered.*

---

[10]The defendant argues that the judge's pro-prosecution tone was manifest during final instructions by (1) his observation that "this is not a complicated case anyway in terms of cases"; (2) his comment that "arson is a crime which is not ordinarily established by direct evidence," implying that the lack of direct evidence as to arson was normal; and (3) his comment that the theory of transferred intent relative to the charge of assault with intent to commit murder was "very simple." The defendant further takes issue with the judge's comment to the jury, during the examination of Robin Peebles, that there was "nothing illegal" in her having a copy of her grand jury testimony. This comment, he alleges, evinced impatience with defense counsel and a lack of impartiality. The defendant objected to the *Webster* charge but not to the judge's comments.

[11]At the start of his charge to the jury, the judge stated, "During the course of [the trial], you probably noted that there was some interaction on occasion between the bench and the lawyers or the bench and a witness. . . . That has nothing to do with the case as you should consider it. That happens in the course of every trial, it's just inevitable, nothing to do with how you should decide the case." He then added, "If the actions of this court, that is myself, the Judge, during the course of this trial . . . if any of these matters have in any way intimated to you how I think you should decide this case, you are to completely disregard any such intimations. How you decide this case is entirely up to you, it doesn't matter to me how you decide the case. I, as the judge, am neutral in this case, as I am in every case, and as I must be."