Fishman, Kenneth J., J.
The defendant, Samuel K. Jones, was indicted for stalking in violation of a restraining order under G.L.c. 365, §43(b) (Indictments 001 and 002),[1] stalking under G.L.c. 365, §43(a) (Indictment 006), threats under G.L.c. 275, §2 (Indictments 009 and 010), assault with a dangerous weapon under G.L.c. 265, §15B(b) (Indictment 005), intimidation of a witness under G.L.c. 268, §13B (Indictments 003[2] and 004), and violation of a protective order (Indictments 007 and 008). The case is now before this Court on the defendant’s Motion to Dismiss the Indictment, based on claims that G.L.c. 365, §43(b) is unconstitutionally vague, that there was insufficient evidence to support the indictments, and that the integrity of the grand juiy proceeding was impaired by the presentation of uncharged conduct. For the reasons below, the defendant’s Motion is DENIED.[3]
*239 BACKGROUND
Viewed in the light most favorable to the Commonwealth, the grand juiy could reasonably have found the following facts. See Commonwealth v. Caracciola, 409 Mass. 648, 649 n.1 (1991).
In or about 1999, the defendant began a romantic relationship with Milette Gilliam. The couple had one child together. Around 2003, the defendant began to use crack cocaine and would become physically abusive when he lacked the means to get high. He was also verbally abusive to Gilliam’s two children. In March 2003, the couple relocated to Alabama. The defendant continued to use drugs and be abusive toward Gilliam. In one incident, he beat and kicked her to an extent that she had to go to the hospital. Gilliam ended the couple’s relationship and returned to Boston after the defendant’s drug dealer appeared at her house and threatened her and her children. The defendant also returned to Massachusetts at that time, but stayed in Springfield with his family.
On or about March 13, 2010, the defendant contacted Gilliam on her cellular phone, and stated, “You should have known I’d get your number. That’s how you want to play it. I will see my daughter. Believe that, even if I have to take matters into my own hands. You think this is a game? Let’s see who’s laughing when I put a bullet in your head.” Approximately 15 to 20 minutes later, Gilliam received a text message from the defendant containing a picture of himself holding a gun. At some point after that, but prior to March 19, 2010, Gilliam spoke with the defendant’s ex-wife who informed her that the defendant was planning on going to Brookline (where Gilliam lived) on or about that date.
On March 19, 2010, Gilliam went to the Brookline Police Department to file a restraining order against the defendant. She spoke with Officer Michael Heavey, and informed him of the phone call and picture message that she had received on March 13, that she had learned of the defendant’s intent to visit her from his ex-wife, and that she had received several letters from the defendant in the past that were threatening in nature. She had discarded all of the letters except one, dated February 2006, which she gave to the Brookline Police. That letter contains statements which declare: that the defendant “will kill anyone that stands in the way of [him] and [his] child”; “please understand that if anyone, anyone was to try to take them from me they will die. I will play no more games with you”; “I’m ready to go to war with anyone over this. Believe me someone will die”; and “If I can’t have a part in her life, no one will.” During the conversation with Officer Heavey, Gilliam was timid and became increasingly upset. She was very upset when asked to discuss the details of the past relationship.
On March 19, 2010, a restraining order was issued against the defendant that included conditions that he not contact Gilliam in person, by phone, or in writing, directly or through a third pariy, and that he stay at least 100 yards away from her. The defendant was served a copy of the restraining order that evening. The expiration date for that restraining order was April 1, 2010.
On March 26, a phone call was made from the Norfolk County House of Corrections to Gilliam’s phone. The call was not answered.
On March 27, 2010, Gilliam received a collect call from the phone number 781-326-2861, a number identified to the grand jury as belonging to the Norfolk County House of Corrections. Upon answering, she heard the normal collect call recorded introduction, “You have a collect call from,” which was followed by/interrupted by a voice stating, “Come on man, don’t do this shit, man.” Gilliam hung up the phone when she recognized the voice as belonging to the defendant.
On April 1, 2010, following a hearing, the restraining order was extended until March 31, 2011. The defendant was present at the hearing and received a copy of the order. Gilliam was also present, and, while waiting for the hearing to begin, she informed the victim witness advocate of the March 27 phone call as well as a voicemail she had received from the defendant’s mother on March 21, 2010, stating, “You need to call me about this.” Records from the Norfolk County House of Corrections indicated that the defendant had been in the custody there as of March 20, 2010. The records further indicate that, during the time relevant here, the defendant did not place any phone calls to Gilliam;[4] however, two phone calls to Gilliam’s cell phone were made by an inmate in the same section or block as the defendant. The first of these phone calls took place on March 26, and was not answered. The second took place on March 27, and the records indicate that the party that answered hung up.
On April 29, 2010, Gilliam again spoke with Officer Heavey of the Brookline Police. She shared with him a letter, postmarked April 27, 2010, that she had received from the defendant. In the letter, the defendant, writing as “Peabody,”[5] begs Gilliam to drop the charges, telling her that “Sam” did not mean what he had said and that “Sam” would never hurt her. The letter also states, “You know he still got them nasty pictures of you. This can get ugly, Mee-Mee.”
DISCUSSION
The defendant’s Motion to Dismiss is based on three claims. First, he argues that the stalking law is unconstitutionally vague. Second, he contends that there was insufficient evidence for the grand jury to indict him on various counts. Finally, he maintains that the grand jury proceedings were impaired.
1. Constitutional Claim
The defendant alleges that a portion of the Massachusetts anti-stalking statute is unconstitutionally *240 vague. That statute reads in relevant part: “(a) Whoever (1) willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) makes a threat with the intent to place the person in imminent fear of death or bodily injury, shall be guilty of the crime of stalking.”[6] G.L.c. 265, §43(a). Section 43(b) addresses stalking that occurs in violation of a protective order.[7] The defendant claims that the phrase “over a period of time” is unconstitutionally vague because it “permits the Commonwealth to rely on an event or events remote in time that when packaged with a third, more recent event may give rise to a charge of stalking.” This, he argues, violates the requirements of due process because it vests too much discretion in the Commonwealth.
a. Void for Vagueness Standard
A penal statute is “void for vagueness” if it fails to “define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.” Commonwealth v. Williams, 395 Mass. 302, 304 (1985), quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983). “Proscribed conduct need not, however, be set forth by ‘precise legal definition’ or with ‘mathematical precision,’ ” Commonwealth v. Dunn, 43 Mass.App.Ct. 58, 59 (1997), and a “law is not vague if it requires a person to conform his conduct to an imprecise but comprehensive normative standard so that men of common intelligence will know its meaning.” Commonwealth v. Taylor, 413 Mass. 243 (1992). “When examining a criminal statute for possible unconstitutional vagueness, [the court] may go beyond the actual language of the statute to give meaning to the words and phrases according to their common law meaning or statutory history.” Dunn, 43 Mass.App. at 59, citing Commonwealth v. Gallant, 373 Mass. 575, 581 (1977). “If the language of the statute is ‘fairly susceptible [to] a construction that would lead to a logical and sensible result,’ [the court] will construe [it] so as to make [it an] effectual piece of legislation in harmony with common sense and sound reason.” Commonwealth v. Williams, 427 Mass. 59, 62 (1998), quoting Commonwealth v. A Juvenile, 16 Mass.App.Ct. 251, 254 (1983). “[I]n determining whether a statute is unconstitutionally vague, [the court] may consider limiting judicial constructions which have been employed in its interpretation.” Commonwealth v. Frieberg, 405 Mass. 282, 289 (1989), citing Kolender v. Lawson, 461 U.S. 352, 355 (1983).
b. Analysis
While the phrase “over a period of time” may be indefinite, it is not vague. Read in context of the entire statute and given its plain meaning, it simply means that there must be at least some minimal separation between incidents. See Victor V. v. Commonwealth, 423 Mass. 793, 794 (1996) (“Where the statutory language is clear, the courts must give effect to the plain and ordinary meaning of the language”). The defendant’s argument that this language is unconstitutional because it vests too much discretion in the Commonwealth and permits arbitrary enforcement is unavailing because the ability to use incidents separated by lengthy periods of time is strictly limited by other language in the statute, including the natural meaning of the preceding phrase, “pattern of conduct or series of acts.” See Commonwealth v. Welch, 44 Mass. 80, 85 (2005) (applying general rule of statutory construction that, “a statute is to be interpreted according to the intent of the legislature ascertained from all its words construed by the ordinary and approved usage of the language”).
Pursuant to the natural construction of the stalking section, the purpose of the contested language is to modify the phrase “pattern of conduct or series of acts.” In order to determine whether “over a period of time” opens the door to arbitrary enforcement and unfettered discretion, the meaning and purpose of “pattern of conduct or series of acts” within the statute must be considered. In Commonwealth v. Kwiatowski, the Supreme Judicial Court interpreted this phrase as requiring more than two incidents. 418 Mass. 543, 548 (1994). In Welch, the Court examined the “nature and scope” of that same phrase within the closely related, lesser included offense of criminal harassment. 444 Mass. at 84, 89. See also G.L.c. 265, §43A. Specifically, the Court considered the meaning of the words “pattern” and “series,” and determined that the phrase required the Commonwealth to prove at least three incidents. Id. at 89-90. This determination was based in part on Kwiatowskis interpretation of the stalking statute, and, more important with respect to the present challenge, because “the dictionary definition of ‘series’ is ‘a group of usu[alfy] three or more things or events standing or succeeding in order and having a like relationship to each other.’ ” Id., citing Webster’s Third New Int’l Dictionary 2072 (1993) (emphasis added).
Thus, the phrase “pattern of conduct or series of acts” limits the Commonwealth’s discretion in two important ways. First, it requires that there be at least three incidents involved. Second, it requires that the three incidents be related in some way to each other. It is this relationship requirement, and not the timing of the incidents, that ultimately insures that the statute will not be construed or applied arbitrarily because an event remote in time is actionable only to the extent it is sufficiently related to the other two incidents that are used to support the charge. It follows then that the phrase “over a period of time” does not permit arbitrary enforcement; it simply modifies the limiting phrase “pattern of conduct or series of acts” by emphasizing the need for some minimal amount of separation between incidents.
*241 This requirement of three incidents for a charge of stalking is also defined and limited by the other elements of the crime, namely that (1) the defendant’s conduct be willful and malicious, (2) the conduct be directed at a specific person, (3) the conduct be of the type that would seriously alarm or annoy that person and would cause a reasonable person to suffer substantial emotional distress, and (4) that the defendant made a threat with the intent to place the person in imminent fear of death or bodily injuiy. Thus, while the phrase “over a period of time” only requires incidents separated in time, those incidents must meet the requirements to establish a pattern, as well as the other elements of the crime.
By its ordinary language, the stalking statute therefore “provides ‘comprehensible standards that limit prosecutorial and judicial discretion’ and thus avoid[s] discriminatory or arbitrary enforcement.” Commonwealth v. Hendricks, 452 Mass. 97, 102 (2008), citing Commonwealth v. Pagan, 445 Mass. 161, 173 (2005). The remaining question is whether the statute “provides a reasonable opportunity for a person of ordinary intelligence” to know that the type of conduct in which the defendant engaged was prohibited. See Hendricks, 452 Mass. at 102, quoting Commonwealth v. Jasmin, 396 Mass. 653, 655 (1986). See also Commonwealth v. Bohmer, 374 Mass. 368, 371-72 (1978). As explained above, the language of the statute is clear in what it prohibits. Here, a person of ordinary intelligence should reasonably understand that repeated death threats directed at a specific person fall “ ‘squarely within the statute,’ [and therefore] there is no merit to the argument that the statute was unconstitutionally vague as applied to him.” Commonwealth v. Marshall, 65 Mass.App.Ct. 710, 717 (2006), quoting Commonwealth v. Poillucci, 46 Mass.App.Ct. 300, 305 (1999).
2. The Indictment
a.Sufficiency of the Evidence
To obtain an indictment, the Commonwealth must present the grand jury with sufficient evidence to establish the identity of the accused and probable cause to arrest him or her. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1993). Probable cause to arrest exists where the facts and circumstances within the police officer’s knowledge at the time of the arrest serve as “reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.” Commonwealth v. Stevens, 362 Mass. 24, 26 (1972), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause requires “more than mere suspicion but something less than evidence sufficient to warrant a conviction.” Commonwealth v. Roman, 414 Mass. 642, 647 (1993). To establish probable cause, the Commonwealth must present the grand juiy with evidence of each element of the crime charged. Commonwealth v. Moran, 453 Mass. 880, 884 (2009).
b.Assault with a Dangerous Weapon
“The crime of assault breaks down into two subcategories: an attempted battery (e.g., intentionally swinging at a person with a baseball bat and missing) or a threatened battery (e.g., waving a bat toward a person in an overt and objectively menacing way).” Commonwealth v. Chambers, 57 Mass.App.Ct. 47, 48 (2003). For an attempted battery, the Commonwealth must show that a person took “an overt step toward making intended physical contact (touching) to which the target has not consented and coming pretty near to accomplishing the crime.” Id. at 48. For a threatened battery, the Commonwealth must show that the defendant engaged in objectively menacing conduct with the intent to put the victim in fear of immediate bodily harm. Commonwealth v. Musgrave, 18 Mass.App.Ct. 519, 524 n.7 (1995), S.C., 421 Mass. 610 (1996), quoting Commonwealth v. Marcotte, 18 Mass.App.Ct. 391, 394 (1984). “(A]s a general rule words are not sufficient to constitute an assault.” Commonwealth v. Delgado, 367 Mass. 432, 436 (1975). Assault with a dangerous weapon requires the Commonwealth to show an additional element, namely that the assault was perpetrated by means of a dangerous weapon. Commonwealth v. Melton, 436 Mass. 291, 294 (2002).
Here, the defendant’s threat to “take matters into [his] own hands” and “put a bullet in [Gilliam’s] head,” followed thereafter by the photographic proof of his apparent ability to cany through on his threat, is sufficient to establish probable cause for assault with a dangerous weapon. A threat to a person’s life followed shortly thereafter by images evidencing the defendant’s ability to carry through on those threats would cause a reasonable person apprehension.
c.Stalking
The defendant is charged with both stalking in violation of aprotective order, G.L.c. 265, §43(b) (count 001), and the lesser included offense of stalking under G.L.c. 265, §43(a) (count 006). Both crimes require the Commonwealth to show that the defendant (1) willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) makes a threat with the intent to place the person in imminent fear of death or bodily injury. As noted previously, a pattern or series of conduct requires proof of at least three incidents. See Kwiatkowski, 418 Mass. at 548. The crime of stalking in violation of a protective order requires the additional proof that a defendant who is guilty of stalking has violated a restraining order. G.L.c. 265, §43(b).
With regard to Indictment 001, the grand jury heard evidence that the defendant contacted Gilliam at least three times—by phone on March 26 and 27, and by letter on April 29—after the court had ordered him not *242 to contact her. Such contact, occurring so soon after, and in blatant disregard of the no-contact order, would cause a reasonable person to suffer substantial emotional distress. Furthermore, the grand jury heard testimony that Gilliam did feel alarmed by the contact, as she had the phone company block the Norfolk jail number and took the letter to the police station. Finally, there was evidence that, among other things, the defendant wrote in the letter, “This can get ugly, MeeMee.” Given the restraining order and the defendant’s previous threats, this is sufficient to establish the threat element of stalking. See Commonwealth v. Matsos, 421 Mass. 391, 394 (1995) (Commonwealth need only prove that “the defendant made a threat with the intent to place the victim in imminent fear of death or bodily injury”); Commonwealth v. Julien, 59 Mass.App.Ct. 679, 685 (2003).
With regard to Indictment 006, the grand jury heard evidence that the defendant sent Gilliam a letter on February 12, 2006, in which he threatened to kill anyone who interfered with his ability to see his daughter; that he called Gilliam on March 13, 2010, and again threatened to kill her by “putting a bullet in [her] head”; and that he subsequently sent her a picture on her cellular phone showing himself holding a gun. These incidents caused Gilliam to take out a protective order against the defendant. Such repeated, specific threats against a person’s life would cause a reasonable person to suffer substantial emotional distress, and the fact that Gilliam took out a protective order against the defendant shows that she was seriously alarmed or annoyed by his conduct. These facts are sufficient to support the charge for stalking.
d. Threats
The defendant is charged with threats under G.L.c. 275, §2, which states, “If complaint is made to any such court or justice that a person has threatened to commit a crime against the person or properly of another, such court or justice shall examine the complainant and any witnesses who may be produced, on oath, reduce the complaint to writing and cause it to be subscribed by the complainant.” (Emphasis added.) By its terms this section describes the process for issuing a criminal complaint against a person who has threatened to commit a crime. The defendant’s case, however, is before this Court on an indictment issued by a grand juiy. Section 2 of Chapter 275 makes no reference to grand juiy proceedings, and, indeed, no justice or court is involved in the examination of witnesses in the grand juiy process. Nor is there anything in the record before this Court to indicate whether Gilliam appeared and testified in the district court relative to this offense.
Assuming, without deciding, that §2 applies to grand juiy proceedings, dismissal of this indictment would not be an inappropriate remedy here for the failure of the Commonwealth to call Gilliam to testify before that body. See Commonwealth v. Jacobsen, 419 Mass. 269, 275 (1995). Dismissal is a drastic remedy that “turns primarily on the ability of the defendant to obtain a fair trial after, and in light of, the police misconduct.” Id. at 276. Although the grand juiy did not hear from Gilliam directly, it did hear Officer Heavey and Detective Molloy testify regarding statements Gilliam had made to them in their official capacities about the defendant’s threats. Detective Molloy read portions of the written statement Gilliam submitted to support her application for the restraining order, including Gilliam’s description of the phone call and picture message threat on March 13. Officer Heavey read portions of the February 12 letter, including one that stated, “I will kill anyone that stands in the way of me and my child.” Any potential prejudice from not hearing from Gilliam directly was thus mitigated by the fact that the grand juiy heard her accounts from other sources.
3. Impairment of the integrity of the grand juiy process
Finally, the defendant alleges that the integrity of the grand juiy proceeding was impaired because the Commonwealth introduced evidence of uncharged misconduct including the defendant’s prior drug use, and his violence and abuse toward Gilliam and her children. While this evidence related to uncharged conduct, it was nonetheless relevant for establishing context and Gilliam’s state of mind, fear and alarm as elements of the charged offenses. See Commonwealth v. Martinez, 43 Mass.App.Ct. 408, 412 (1997), quoting Commonwealth v. Matsos, 421 Mass. 391, 392 n.3 (1995) (“The defendant’s prior acts of violence against [victim] . . . were relevant to and probative of either or both the stalking and c. 209A charges. The Commonwealth is entitled to present to the juiy, in a case brought under c. 265, §43, ‘evidence of the totality of the defendant’s conduct toward the victim’ ”). The evidence related to uncharged conduct was not deceptive or false, there is no showing that it was offered knowingly and for the purpose of obtaining an indictment, and no showing that it probably influenced the grand juiy’s decisions to hand up the indictments. See Commonwealth v. Pond, 24 Mass.App.Ct. 546, 551 (1987), review denied, 400 Mass. 1106 (1987).
ORDER
Based on the foregoing, defendant’s Motion to Dismiss the Indictment is DENIED.

At a hearing, this Court allowed the Commonwealth’s Motion to Amend the Indictment, combining Indictments 001 and 002 into a single indictment.

The Commonwealth concedes that there was insufficient evidence to support Indictment 003, and, therefore, that Indictment has been dismissed.

The defendant has offered no argument to support the Motion to Dismiss with regard to Indictments 004, 007, and 008.

Phone calls can be tracked via pin numbers.

Gilliam explained that “Peabody” was her old nickname for the defendant.

The statute further provides: ‘The conduct, acts or threats described in this subsection shall include, but not be limited to, conduct, acts or threats conducted by mail or by use of a telephonic or telecommunication device or electronic communication device including, but not limited to, any device that transfers signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system, including, but not limited to, electronic mail, internet communications, instant messages or facsimile communications."

“(b) Whoever commits the crime of stalking in violation of a temporary or permanent vacate, restraining, or no-contact order or judgment issued pursuant to sections eighteen, thirty-four B, or thirty-four C of chapter two hundred and eight; or section thirty-two of chapter two hundred and nine; or sections three, four, or five of chapter two hundred and nine A; or sections fifteen or twenty of chapter two hundred and nine C or a protection order issued by another jurisdiction; or a temporary restraining order or preliminary or permanent injunction issued by the superior court, shall be punished by imprisonment in a jail or the state prison for not less than one year and not more than five years. No sentence imposed under the provisions of this subsection shall be less than a mandatory minimum term of imprisonment of one year.” G.L.c. 265, §43(b).