COMMONWEALTH *vs.* SAMUEL J. BAKER.

No. 05-P-985.

Middlesex. September 20, 2006. - November 20, 2006.

Present: DOERFER, KAFKER, & MILLS, JJ.

*Homicide. Evidence,* Medical record. *Proximate Cause. Practice, Criminal,*
   Instructions to jury.

At the trial of an indictment charging manslaughter, the evidence, including
   expert testimony, photographs of the victim's injuries, and the defendant's
   admissions regarding the severity with which he repeatedly beat the victim,
   was sufficient to prove beyond a reasonable doubt that the beatings inflicted
   by the defendant were a proximate cause of the victim's death. [763-767]
The judge at the trial of an indictment charging manslaughter properly admit-
   ted in evidence prior bad acts of the defendant (specifically, evidence relat-
   ing to prior injuries sustained by the victim, inferentially at the hands of
   the defendant), where the evidence was relevant to the issue of proximate
   cause, the hostile nature of the relationship between the victim and the
   defendant, or the defendant's motive and intent to inflict the injuries.
   [767-770]
The voluntary manslaughter instruction given in a case in which the defendant
   was not charged with murder was proper. [770-771]

INDICTMENT found and returned in the Superior Court Depart-
ment on September 6, 2001.

The case was tried before *Leila R. Kern,* J.

*Bruce Ferg,* Committee for Public Counsel Services, for the
defendant.

*Lee Hettinger,* Assistant District Attorney, for the
Commonwealth.

KAFKER, J. The defendant was indicted by a Middlesex County
grand jury for manslaughter committed between July 3 and July
8, 2001. The victim was his girlfriend. After a jury trial in
Superior Court, the defendant was convicted of the single
manslaughter count. On appeal, the defendant argues that (1) his
motion for required finding of not guilty should have been al-

lowed because there was insufficient evidence to prove that the beatings he inflicted were the proximate cause of the victim's death; (2) it was error for the judge to admit, over objection, medical records and a restraining order relating to prior assaults upon the victim; and (3) the voluntary manslaughter instruction, given in a case in which the defendant was not charged with murder, was flawed. As we conclude that there is no merit to these arguments, we affirm.

We briefly summarize the evidence the jury could have found, leaving for later discussion the details that pertain to the issues raised. On July 8, 2001, at about 9:00 A.M., the police found the badly beaten body of the victim on the floor of a trailer that belonged to the defendant's father. No one was inside the dwelling. The medical examiner arrived that evening between 7:30 P.M. and 8:00 P.M. He determined that death had occurred twelve to eighteen hours earlier. The next day, he performed an autopsy and concluded that "acute ethanol intoxication and multiple traumatic injuries" and "ongoing severe physical abuse" led to the immediate cause of death, which he identified as "cardiopulmonary arrest." The victim had a blood alcohol level of .326 percent.

The evidence showed that prior to her death, the victim had a long history of alcohol abuse that included several hospitalizations. The defendant told police that he had picked the victim up on June 26, 2001, after her last hospitalization. The two began to drink, and according to the defendant, "Everything became a blur after that." He and the victim were staying at his father's trailer because his father was visiting his brother in Indiana and was not due to return until July 7, 2001. After June 26, 2001, the defendant never went back to a $114,000 per year position he had recently obtained at a bank.

On June 27, 2001, he and the victim began to fight, and the victim left the trailer. That evening, the defendant knocked on the door of Pedro Oliveira, a neighbor. At that time, the defendant was crying and extremely upset and angry. Oliveira testified that the defendant said the victim had taken off to be with another man and that "he wanted to kill her" and "beat the shit out of her." On June 29, 2001, according to a State police officer who had spoken with the defendant, the victim

called the defendant and asked him to come and get her because she was being beaten up. The defendant complied and brought her back to the trailer.

On July 6, 2001, the victim called her longtime friend, George Carreras, and asked him to bring her and the defendant to the bank the next morning so they could cash the defendant's pay check. Carreras arrived at about 10:30 A.M. on July 7, 2001. Carreras noticed that the victim's feet were bruised and swollen and that she had difficulty walking. He also noticed that she was wearing a long sleeve shirt and long pants despite the very hot and humid weather. He brought them to the bank where the defendant obtained one hundred dollars in cash. On their way back to the trailer, they stopped, and the defendant bought vodka and a soft drink.

During the next one and one-half hours that Carreras spent in their company, he saw them drink alcohol and begin to argue and fight. The defendant got angry and blamed the victim for the loss of his job. After about one-half hour, they calmed down and the three went outside to a deck attached to the trailer. As Carreras headed to his car, the victim suddenly ran behind him using him "like . . . a shield," and the defendant stepped in front of him. The defendant's and victim's voices had become loud again. Eventually the two calmed down and returned to the deck. Before Carreras left, the defendant promised that he would not hurt the victim.

At about 8:00 P.M. that evening, the defendant's father arrived home. He was not happy that the victim was there and told her to go home. He went to bed but got up several times during the night. Once he saw the victim sitting on the couch, then at the kitchen table, and finally on the floor with the defendant. When the defendant's father got up in the morning, the defendant told him, "She's gone," which the father took to mean that she had left. The defendant asked his father for a hug and said, "Something bad has happened." When the defendant's father asked, "Where's [the victim]" the defendant pointed to the blanket. The defendant's father lifted up the corner of the blanket and then tried to call 911. The defendant prevented his father from doing so. The defendant's father left the trailer and went to his daughter's house, where he called 911. The defendant fled from the trailer.

The defendant was apprehended on July 12, 2001, when he tried to cash a check at the Middlesex Savings Bank. He told police that he had fled into the woods because he was "scared" and "thought he was going to get blamed." At the police station, the defendant admitted that he had hit the victim "awhile ago," but refused to tell them whether he had hit her on July 7, 2001. He also said that he had tried to clean up blood stains left by the victim when she was menstruating, that he saw blood coming out of the victim's nose and mouth area, and that he had tried doing cardiopulmonary resuscitation on the victim. He denied seeing any bruises on the victim's arms and legs, but thought that she may have gotten those bruises elsewhere or from a neighbor. He said that he had seen bruises on the victim's feet and that she had dropped a vacuum cleaner on her feet and injured them. The police discovered a mop and cleaning fluid in the trailer.

While the defendant was held in jail in lieu of bail, he met a man named Josmer Filho, who was also being held in jail on criminal charges. By the time trial commenced, Filho had been deported to Brazil, but his videotaped deposition was admitted in evidence. The defendant told Filho that he had beaten the victim three times over the course of July 7 and July 8, 2001. The defendant said that he and the victim had been drinking and that, when they got into an argument, "he beat the hell out of her." The defendant also said that, sometime later, the victim "started giving him shit again" and that he beat her with a broom handle. On the third occasion, he used a broom handle again, and told Filho that "he got up and he grabbed her, . . . [that] he knew he had lost it right then, and [that] he was going to kill her." The defendant further said that the victim "got knocked out cold" and that, at some point, he dragged her from "where she got knocked out cold and put a blanket over her."

The defense focused almost exclusively on whether the victim's injuries were a proximate cause of her death. A defense expert opined that the victim had died solely as the result of alcohol poisoning.

1. *Proximate cause.* The defendant argues that the evidence was insufficient to establish that the injuries he inflicted upon the victim were a proximate cause of her death. Proximate cause "is a cause, which, in the natural and continuous sequence,

produces the death, and without which the death would not have occurred." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980), quoting from California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979). A proximate cause "need not be the sole or exclusive cause of death." *Commonwealth* v. *Santiago*, 425 Mass. 491, 504 (1997). See *Commonwealth* v. *Maynard*, 436 Mass. 558, 563 (2002) ("there may be more than one proximate cause of a victim's death"). "Where a defendant causes an injury which, along with other contributing factors or medical sequella of the injury, leads to death, jurors may determine that the defendant's acts were the proximate cause of the injury." *Commonwealth* v. *Perry*, 432 Mass. 214, 225 (2000). Those contributing factors may include preexisting conditions of the victim: a defendant "takes the victim as he . . . finds [her]." *Commonwealth* v. *Starling*, 382 Mass. 423, 429 (1981). To be proximate, however, a cause cannot be too "remote in the chain of events leading to [the victim's] death." *Commonwealth* v. *Rhoades*, 379 Mass. at 824.

Here, the evidence showed that thirty separate areas of the victim's body had sustained blunt force trauma. The photographs introduced at trial depicted a badly beaten woman. There was serious swelling and bruising of portions of her skull as well as significant skin injuries. The medical examiner, who conducted an autopsy on July 9, 2001, estimated the injuries ranged in age from one to twelve days old, with many of the most severe being between three to five days old. The defendant acknowledged that he had been with the victim during the entire period from June 29, 2001, until the date of her death. The injuries included two patterned injuries on her upper left arm and her upper left thigh, suggesting that she had been struck with a long, firm object. The medical examiner's internal examination of the brain revealed mild to moderate swelling, indicating injury to the brain. He found subdural bleeding on the left side and testified that a substantial amount of force is needed to cause such an injury. The neuropathology examination conducted by another doctor revealed, in addition to the subdural hemorrhage, two subarachnoid hemorrhages, one in the right frontal lobe and another area at the back of the left occipital region. The medical examiner testified that greater force is required to cause a sub-

arachnoid hemorrhage than a subdural hemorrhage because the arachnoid membrane is closer to the interior of the brain.

In addition to the fresh injuries evident in the brain, the victim's medical records showed that she had suffered subdural and subarachnoid hemorrhages about six months earlier. The medical examiner said that, in such cases, any further injury causes a more adverse response than the previous time. Thus, even if a later blow to the head is less severe, a more severe reaction can occur.

The medical examiner also examined the victim's organs. He testified that the heart showed signs of damage that had occurred over time from excessive alcohol abuse. The damage would have affected its pump efficiency and its ability to respond to stress or trauma, but alone, the damage would not have caused death. The liver was similarly compromised and showed early signs of cirrhosis, but again, alone, the damage would not have been fatal.

In addition, the medical examiner testified that, while the victim's blood alcohol level of .326 was high, it was not the cause of death. He explained that a chronic alcoholic's ability to tolerate alcohol increases over time as the body makes the necessary adjustments to be able to take in greater and greater amounts of alcohol with lesser effect. He testified that this amount of alcohol, even in a novice, would be highly unlikely to cause death. He stated that when death occurs by acute alcohol intoxication, there is evidence of a coma for some period of time preceding death, large amounts of urine collect in the kidneys, and severe swelling of the brain that puts pressure on and suppresses the "brain stem centers that control respiration and other important bodily functions." The medical examiner detected none of these factors in the victim.

The medical examiner gave the following opinion regarding the cause of death:

> "[T]he cause of death was ultimately the heart and the lung gave out, and that is cardiopulmonary arrest. And the situation included multiple factors. There was definitely acute alcohol intoxication. There was some amount of changes due to chronic alcohol intoxication. *But there was* [*sic*]

*these severe and extensive injuries, blunt trauma to the body, which had to have played a major role in the mechanism of death.* . . . The acute alcohol intoxication in itself was not large enough, was not high enough to kill. The changes of the chronic alcoholism were not severe enough to kill by itself. So, I had to find another reason. And there was definitely severe trauma to the head which caused bleeding, subdural hemorrhage, inside the skull, probably contributed in some part to the swelling of the brain. *Plus with so much of skin injury there was some amount of generalized debility introduced into the patient which caused a kind of general compromise of all bodily functions and downstream led to the failure or the arrest of the heart and the lung.*" (Emphasis supplied.)

On cross-examination, he further explained that the "[m]ultiple contusions, the brain swelling, the subarachnoid and subdural hemorrhage, in combination with alcohol" caused the victim's death. The multiple trauma "in and of itself" did not.

Viewed in the light most favorable to the Commonwealth, as is required, the evidence was sufficient to prove that the beatings inflicted by the defendant were a "cause, which in the natural and continuous sequence, produce[d] the death, and without which the death would not have occurred." *Commonwealth* v. *Rhoades*, 379 Mass. at 825, quoting from California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979). The expert testimony and the photographs of the victim's injuries, combined with the defendant's admissions regarding the severity with which he repeatedly beat the victim, permit an inference that the blows that he inflicted were a "sufficiently contributing proximate cause of death."[1] *Commonwealth* v. *McLeod*, 394 Mass. 727, 748, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985).

The defendant argues that, because the medical examiner testified that multiple blunt force trauma was only one of a combination of factors that caused the victim's death and would

---

. [1]Where, as here, the defendant moved for a required finding at the close of the all the evidence, in addition to at the close of the Commonwealth's case, we consider whether the Commonwealth's case deteriorated after it rested and conclude that it did not. See generally *Kater* v. *Commonwealth*, 421 Mass. 17, 20 (1995).

not alone have caused the death, it can only be viewed as a contributing cause of death and that, under *Commonwealth* v. *Rhoades, supra,* a contributing factor is insufficient to constitute proximate cause. The defendant fails to recognize that the *Rhoades* court was not troubled with the notion that a contributing factor of death may also be a proximate cause of death. Rather, the difficulty the court had was with the additional language the trial judge used in connection with the term "contribute." In *Rhoades,* the judge's instruction improperly suggested to the jury that an act which "in any way contributed to hasten" or "in any way constituted a link, no matter how remote" in the chain of events leading to death, permitted a finding of guilt.[2],[3] *Id.* at 823-824.

Cases decided after *Rhoades* have also concluded that a contributing cause can be a proximate cause of death and have recognized that there may be a combination of causes that result in death. See, e.g., *Commonwealth* v. *Davis,* 403 Mass. 575, 582 (1988) (blow to the head was the proximate cause of death even though extreme cold contributed to the death as well). See also *Commonwealth* v. *Maynard,* 436 Mass. at 564, quoting from *Commonwealth* v. *McLeod,* 394 Mass. at 745 n.21 ("When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death").

Here, the evidence was sufficient to prove beyond a reasonable doubt that the beatings inflicted by the defendant were a proximate cause of the victim's death.

2. *Prior bad acts.* Next, the defendant argues that it was

---

[2]The court noted that a "finding that Rhoades' conduct [in starting a fire] was the proximate cause of [the firefighter's] death [from a heart attack] is an inference that a jury could well have drawn from the evidence in the case" but that reversal on this charge was required because the defendant was "entitled to have the law [of proximate cause] correctly explained to the jury." *Commonwealth* v. *Rhoades,* 379 Mass. at 824 n.13.

[3]The other case relied on by the defendant, *Commonwealth* v. *Flynn,* 420 Mass. 810, 815 (1995), is even further afield. In that case, the cause of death to the victim were blows to the neck and head, and there was no evidence that the blows inflicted by the defendant were above the chest.

prejudicial error to admit, over objection, the following evidence concerning two prior bad acts. First, a police officer testified that on January 19, 2001, he went to a motel in response to a call and found the defendant blocking the entryway to one of the rooms. When the officer eventually gained entry to the room, he saw the victim sitting on the bed, her face severely swollen. The victim was taken to the hospital. Her medical records, which were admitted in evidence, showed that she had suffered a right orbital (eyesocket) fracture, a nasal septal fracture, a left subdural hematoma, a subarachnoid hemorrage, a broken wrist, and multiple contusions. Upon her release from the hospital, the victim obtained a restraining order against the defendant, and a copy of the order was admitted in evidence.

A second police officer testified that on May 31, 2001, he responded to the defendant's home. The defendant answered the door while the victim sat at a table behind him. The victim's lip was bleeding and swollen, and she had bruising around her eyes. No direct evidence was introduced as to either incident regarding the identity of the perpetrator.

With respect to the first incident, the medical evidence was properly admitted as part of the proof of proximate cause. The medical examiner had reviewed the records of her hospitalization in conjunction with determining the cause of death. He gave an opinion that the victim's brain had been compromised as the result of the injuries she sustained on January 19 and that any further trauma would "make[] [the brain's] response much worse than the previous time." The preexisting condition could have exacerbated the injuries the defendant inflicted, making it more likely that death would ensue. As we have said previously, the wrongdoer "takes the victim as he . . . finds [her]." *Commonwealth* v. *Starling*, 382 Mass. at 429. *Commonwealth* v. *Tevlin*, 433 Mass. 305, 313 (2001). Thus, the victim's prior injuries were relevant in determining whether the July beating could have caused her death.

Similarly, the restraining order, combined with the evidence of the victim's injuries sustained on January 19 and May 31, 2001, inferentially at the hands of the defendant, was relevant to show the hostile nature of the relationship. See, e.g., *Commonwealth* v. *Eugene*, 438 Mass. 343, 348-349 (2003) ("Evi-

dence that a victim has obtained an abuse prevention order against the defendant is admissible to demonstrate the existence of a hostile relationship, as the relationship may be relevant to the defendant's motive to kill"); *Commonwealth* v. *Butler*, 445 Mass. 568, 575 (2005). The evidence was also probative of the defendant's motive and intent to inflict the injuries.[4] See *id.* at 574 & n.6, 575 & n.8 (2005). See, e.g, *Commonwealth* v. *Alammani*, 439 Mass. 605, 609-610 & n.4 (2003) (voluntary manslaughter requires proof that the injuries were intentionally inflicted).

Without raising any objection to prosecutor's closing argument, the defendant contends that the argument improperly urged the jury to conclude that the defendant's prior bad acts suggest bad character. The argument was based on the properly admitted evidence and the fair inferences that could be drawn therefrom, that the defendant was responsible for the injuries the victim sustained and that the repeated beatings caused her death. The prosecutor did not suggest or imply that the defendant should be convicted because of his bad character.

The defendant also argues that, even if the prior bad act evidence was properly admitted, it was unduly prejudicial. The argument is unavailing, particularly where the defendant attempted to use the medical evidence to his tactical advantage. Defense counsel repeatedly told the jury in his opening statement and in closing argument that the medical evidence was the critical factor in this case because it showed that the cause of death was acute alcohol poisoning, not the injuries the victim

---

[4] The judge gave one limiting instruction regarding the use of the prior incidents immediately before the testimony related to the May 31, 2001, incident. The judge told the jury the evidence was only being offered for the limited purpose of establishing the defendant's knowledge as to the deceased's susceptibility to certain types of injuries. The judge also told the jury in her final instructions that evidence of a preexisting condition was relevant to the extent that it could not absolve the defendant of criminal liability.

Even if we were to conclude that the admission of the objected-to evidence was error because it did not properly establish the defendant's knowledge of the victim's condition, the outcome would not change, because there were valid grounds for the admission of the evidence in relation to the prior incidents. See generally *Commonwealth* v. *Rogers*, 444 Mass. 234, 235 & n.1 (2005) (reviewing court may affirm rulings on any grounds evident from the record).

sustained. In support of this theory, defense counsel argued that the victim had sustained and survived much more serious injuries in January when her heart and her liver were not likely in any better condition than at the time of her death. He added that the bruises in this case had already started to heal at the time of death, but the "last thing" in her system was "the alcohol, point three-two-six intoxication." The judge's determinations that the probative value of evidence outweighed any prejudicial effect were within her sound discretion. See, e.g., *Commonwealth* v. *Mullane*, 445 Mass. 702, 708-709 (2006).

3. *Instruction on manslaughter when murder was not charged.* Finally, the defendant argues that because he was not charged with murder, he could not be convicted of manslaughter unless the jury were instructed and the Commonwealth proved that he had acted upon reasonable provocation. See, e.g., *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980), quoting from *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931) (in a *murder* trial, a killing may be rendered a voluntary manslaughter if it is the result of "a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat"). The instruction he has requested, however, is exactly the one the Supreme Judicial Court rejected in *Commonwealth* v. *Ware*, 438 Mass. 1014, 1015 (2003), and *Commonwealth* v. *Alammani*, 439 Mass. at 609-610 & n.3.

Provocation "is not an element of voluntary manslaughter, but is rather a defense to murder." *Commonwealth* v. *Ware*, 438 Mass. at 1015. More specifically, provocation is one of the mitigating circumstances that negate malice, an element of murder. Malice and adequate provocation or mitigation are mutually exclusive. *Commonwealth* v. *Boucher*, 403 Mass. 659, 661-662, 664 (1989). *Commonwealth* v. *Whitman*, 430 Mass. 746, 751-752 (2000). When only manslaughter is charged, as here, malice is not a factor in the analysis because it is not an element of the crime. Manslaughter, standing alone, simply requires proof that the defendant intentionally inflicted an injury likely to cause death and which caused her death and that the defendant acted unlawfully. *Commonwealth* v. *Ware*, 438 Mass.

at 1015. *Commonwealth* v. *Alammani*, 439 Mass. at 610. Model Jury Instructions on Homicide 31-33 (1999). It would, therefore, have been error in a case where only manslaughter was charged to add a "third element to the crime, namely, that the Commonwealth must prove that the defendant killed the victim in the heat of passion." *Commonwealth* v. *Ware*, 438 Mass. at 1015.[5]

*Judgment affirmed.*

---

[5]The defendant repeats his claim that the evidence was also insufficient to prove that his blows caused the victim's death. For the reasons already stated in this opinion, we conclude that the evidence was sufficient to prove that the defendant caused the victim's death.