NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-1414                                        Appeals Court

COMMONWEALTH  vs.  RICHARD CHILDS.

No. 16-P-1414.

Middlesex.     December 8, 2017. - September 20, 2018.

Present:  Sacks, Ditkoff, & Singh, JJ.


Indecent Assault and Battery.  Evidence, Prior misconduct.
     Practice, Criminal, Argument by prosecutor.



     Indictments found and returned in the Superior Court Department on May 1, 2012.

     The cases were tried before Robert N. Tochka, J.


     James F. Petersen for the defendant.
     Kate Cimini, Assistant District Attorney, for the Commonwealth.


     DITKOFF, J.  The defendant, Richard Childs, appeals from

his Superior Court convictions on three indictments charging

indecent assault and battery, see G. L. c. 265, § 13H, and one

indictment charging indecent assault and battery on a child, see

G. L. c. 265, § 13B, arising out of his seven-year abusive

relationship with a friend's daughter.  The charged acts, which

occurred in Middlesex County, happened at the beginning and the end of that time period. We conclude that the judge properly allowed the Commonwealth to present evidence that the abuse continued during the period in which the family lived outside Middlesex County to show the nature of the relationship and the absence of mistake or accident. As we also conclude that the prosecutor properly used the uncharged conduct for these purposes during closing argument, we affirm.

1. Background. a. The Commonwealth's case. The victim lived with her parents and her sister, who is two years younger than the victim. The victim's father had a serious problem with alcohol use, and the victim's mother had a severe mental illness that resulted in her spending most of her time in her room. The defendant was a close family friend and had been a part of the victim's life since her infancy.

Prior to the victim's turning seven years old, the victim and her family lived in Hudson in Middlesex County. When the victim was five or six years old, she was in the attic with the defendant, who was teaching her how to read. The defendant began rubbing his penis with his own hand "on the outside of his pants." The defendant then grabbed the victim's hand and rubbed it against his penis, also on the outside of his pants. He continued to read words to her as he did this.

Shortly before the victim's seventh birthday, she and her family moved to Springfield in Hampden County. In Springfield, the defendant would come to the victim's house "mostly every Sunday" during football season to drink alcohol and to watch football games with the victim's father. Whenever the victim's father would leave the room, the defendant would continue his sexual advances towards the victim. He would rub his penis over his pants, lick his lips, and direct gestures indicating intercourse with his fingers toward the victim. The victim "really didn't have any reaction to it."

The victim recounted two specific incidents to the jury from her time outside Middlesex County. When she was seven or eight years old, the defendant brought the victim and her sister "glow in the dark" stickers for their shared bedroom. After the girls affixed the stickers, the defendant expressed his desire to "see . . . how the room looked." This, of course, required turning off the lights. Once the lights were out, the defendant took his penis out of his pants and rubbed it against the victim's face. The victim ran and hid behind a dresser.

When the victim was eight or nine years old, the victim's father asked the victim to accompany the defendant on a drive to Ludlow (also outside Middlesex County) to fill the defendant's gasoline tank. While driving, the defendant rubbed his hands

over the victim's abdomen and on her lap, over her vagina.  She told him to stop, and then he rubbed her cheek.

The victim recounted two other specific acts of molestation that the judge excluded and were not heard by the jury.[1]  One occurred when the victim was ten or eleven years old.  The victim and her sister were in a pool and the defendant exposed his penis to them.  The other involved the defendant's putting his penis in the victim's mouth and then licking her vagina.  The time frame and location for this latter incident was vague; the Commonwealth stated that it occurred when the victim was six years old (before she moved to Springfield), but also stated that it occurred in 2006, when the victim would have been eight or nine years old and living in Springfield.[2]

In 2011, shortly after the victim turned fourteen years old, her family lost electricity to their house in Springfield and decided to return to an empty apartment in Hudson that her family still owned.  The first evening, the victim returned from a visit to her grandmother's apartment to find her father passed

---

[1] The judge also excluded a third act, close in time to the charged 2011 incident, when the prosecutor tried to elicit it in cross-examination of the defendant.  Apparently, it was not included in the Commonwealth's motion in limine.

[2] The victim described to investigators another specific incident that occurred when she was twelve years old, in which the defendant rubbed his penis and then exposed it to her.  The judge did not exclude this incident, but no evidence of it was presented to the jury.

out on a couch, with the defendant sitting next to him watching television.  After the victim and the defendant talked for a while, she asked the defendant if she and her sister could go to his apartment (which was nearby) and use his computer.  He agreed.

After approximately one hour, the defendant returned to his apartment while the victim and her sister were still there.  The defendant put his hand down the back of the victim's shirt and began rubbing her back.  The defendant then moved his hand to the front and touched her breasts underneath her bra.  The victim was "just sitting there."  The defendant touched the victim's "stomach" under her clothes.  Again, the victim was "just sitting there."  The defendant placed a hand over her pants, over her vagina area, and rubbed back and forth.  Again, the victim was "just sitting there."  After "a minute," the defendant stopped.

The victim's sister then went into the hallway to make a telephone call.  The defendant took the victim's finger and sucked on it for approximately thirty seconds, going "back and forth against [her] finger."  The victim was "still sitting there . . . in shock" and "just let it happen."  When the victim's sister returned and saw this, the defendant stopped.  After the victim's sister reentered the room, the defendant rubbed his waist against the victim's shoulder.  The victim

could feel his erection through his pants.  Again, the victim was "still sitting there."

On another evening in the next few days, the defendant repeatedly put his hand on the victim's buttocks, over her clothing.  He said, "Excuse me," but the victim was convinced that it was intentional.

A Hudson police detective interviewed the defendant shortly after the incidents.  According to the detective, the defendant stated that, after tending to the victim's father, he had returned to his apartment.  He wanted to see what the girls were doing on his computer, so he placed his hands on the chair or possibly on the girls' shoulders and leaned forward to see.  He said that "it could have been a possibility" that he had "brushed up against them and maybe touched their breast or something as an accident."

b.  The defendant's case.  The defense was that "this girl made up these allegations against the defendant because of the lack of attention she was getting from her own family."  The defendant testified that the victim and her sister were lonely and had little interaction with their parents.  He took the girls out to eat and bought them clothing.  Once the family moved to Springfield, he visited them every weekend in the summer.

He acknowledged allowing the girls to access his apartment and to use his computer when they were living in Hudson in 2011. When he returned to his apartment, he "put [his] arms around them, . . . gave them a kiss on the head, [and] asked them how they were doing and how was their summer." He occasionally got up to see what they were doing on the computer. He had to put his hands on their shoulders to balance himself when he did this. This happened again the next evening. He denied touching the victim inappropriately in any way. He also denied the charged conduct in the attic when the victim was five or six years old.

Regarding the uncharged driving incident when the victim was eight or nine years old, he remembered having to throw his arm across the victim when braking because she was not wearing a seat belt. He also remembered the uncharged glow in the dark stickers incident. He testified that the door to the bedroom was never closed and that he did not act inappropriately. He also denied the victim's account of weekly sexual gestures and harassment.

The defendant called three social workers as witnesses. One testified that, when the victim was eight years old, she recanted an accusation against the defendant when interviewed by the social worker. When the victim was ten years old, she told another social worker that "she hadn't been sexually abuse[d]."

When the victim was thirteen years old, she denied to a third social worker that she had ever been touched sexually without her consent. The defendant also elicited from a responding officer a description of the victim's 2011 report to the police, which was less detailed than her trial testimony.

2. Discussion. a. Evidence of uncharged conduct. "Evidence of a defendant's prior or subsequent bad acts is inadmissible for the purpose of demonstrating the defendant's bad character or propensity to commit the crimes charged." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). Nonetheless, "[s]uch evidence may be admitted 'to show a common scheme or course of conduct, a pattern of operation, absence of accident or mistake, intent, or motive.'" Commonwealth v. Beaulieu, 90 Mass. App. Ct. 773, 780 (2016), quoting Commonwealth v. Julien, 59 Mass. App. Ct. 679, 686 (2003). Even when relevant, "the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Commonwealth v. Almeida, 479 Mass. 562, 568 (2018), quoting Crayton, supra. These matters are "entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." Commonwealth v. Keown, 478 Mass. 232, 242

(2017), quoting Commonwealth v. Sylvia, 456 Mass. 182, 192 (2010).[3]

Here, the evidence was relevant to show that "the relationship" between the defendant and the victim was one of continuous sexual abuse. Commonwealth v. Centeno, 87 Mass. App. Ct. 564, 567 (2015). See Commonwealth v. Dwyer, 448 Mass. 122, 128-129 (2006), quoting Commonwealth v. Barrett, 418 Mass. 788, 794 (1994) ("some evidence of uncharged conduct may be admissible to give the jury a view of the entire relationship between the defendant and the alleged victim, and the 'probative existence of the same passion or emotion at the time in issue'"). Had the jury been left with the false impression that the defendant had molested the victim once when she was five or six years old and then not again until she was a teenager, her testimony would make little sense. The jury would hear that she was chatting with someone who molested her seven years earlier and asked to go to his apartment to use his computer. Then, when the defendant began molesting her, she was "just sitting there"; she "just let it happen"; she was "still sitting there." This lack of reaction occurred while the defendant went from

---

[3] We assume, without deciding, that the issue was preserved, despite the defendant's lack of objection when the evidence was introduced and the fact that the trial here predated Commonwealth v. Grady, 474 Mass. 715 (2016). Because the trial judge twice revised which acts he would admit and told the defendant that his rights were saved at some points, but not at other points, the issue is complicated.

reaching down her shirt, to touching her breasts under her bra, to rubbing her vagina area over her pajama pants, to sucking her finger, to rubbing his erection against her shoulder.

Once the jury had knowledge that the victim alleged this was part of an ongoing, continuous abusive relationship, the victim's actions and reactions make logical sense. Thus, "the relationship between [the] defendant and [the victim]," Centeno, 87 Mass. App. Ct. at 567, quoting Commonwealth v. Santiago, 52 Mass. App. Ct. 667, 679 (2001), a proper use of uncharged conduct, was important evidence here. See Commonwealth v. Newcomb, 80 Mass. App. Ct. 519, 526 (2011) (uncharged rape of victim when she was fifteen years old properly admitted in prosecution for rapes of victim three and six years later to show "full picture of the entire relationship with the victim"); Beaulieu, 90 Mass. App. Ct. at 780 (in prosecution for domestic battery, judge properly allowed victim to testify that her mother had been hitting her at least two times each month for previous three or four years to provide "the history of the relationship [between the defendant and the victim] to give context to the jury").

The nature of the relationship was particularly relevant here, as the only reason why there is any uncharged conduct is the fortuity that the middle acts of molestation happened in a different county from the beginning and ending acts. Cf.

Commonwealth v. McDonagh, 480 Mass. 131, 143 (2018) (proper introduction of "defendant's out-of-county sexual assaults against [victim] to show his pattern of conduct towards [victim]" mitigated closing argument error). If all of the incidents of abuse had occurred in the same county, they all could have been charged by the Middlesex County district attorney, and there would be no issue about the admissibility of these acts.[4]

The evidence was relevant for another purpose as well. Based on the defendant's statement to the police, it was evident that there would be a question of accident or mistake, as the defendant told the police it "could have been a possibility" that he "brushed up against them and maybe touched their breast or something as an accident." And, indeed, the defendant did ask for, and receive, an accident instruction. The continuous abuse, of course, was powerful evidence rebutting the claim of accident, another proper use for uncharged conduct. Dwyer, 448 Mass. at 128. See Commonwealth v. Roby, 462 Mass. 398, 414

---

[4] In the context of property crimes, the Legislature has created a mechanism for a related course of criminal conduct occurring in different counties to be tried in one court. G. L. c. 266, § 60B. This case suggests consideration might be given to whether a similar mechanism should exist for crimes against the person. Under current law, the district attorney in one county must request of the district attorney in the other county to indict a defendant there and then obtain a court order consolidating the various indictments, see, e.g., Dwyer, 448 Mass. at 126 n.5, neither of which would be necessary in the case of a property crime.

(2012) (evidence of number of times defendant sexually touched each victim properly admitted to undermine defendant's explanation for presence of victim on his lap not wearing a shirt); Commonwealth v. Vera, 88 Mass. App. Ct. 313, 319 (2015) (in prosecution for open and gross lewdness, "[e]vidence of Internet searches for young girl pornography is relevant . . . because it is highly probative of the defendant's intent and the lack of innocent mistake in exposing his genitals to a young girl").

In light of the relevance of the nature of the defendant's continuous relationship with the victim, it was well within the judge's discretion to admit two specific examples of the defendant's abuse during the victim's time outside Middlesex County. In this regard, the judge carefully exercised his discretion, excluding the two most damaging incidents of uncharged conduct. Specifically, the judge excluded the incident that involved the victim's sister as a victim also (the pool incident when the victim was ten or eleven years old), and the incident that involved oral rape. See Vera, 88 Mass. App. Ct. at 322 (judge "selective" in which prior bad acts to admit).

Moreover, as the case developed, the prejudicial tendency of the uncharged conduct was diminished. Because the defendant used the victim's statements, while living in Springfield, to the three social workers denying she had been sexually abused to

attack her credibility, the defendant's evidence (if credited) naturally rebutted the uncharged conduct evidence as well.[5] Furthermore, the defendant had no difficulty remembering the two uncharged incidents and recounting his version of events. Finally, the uncharged conduct was supported only by the victim's testimony, so the admission required no change in the defense theory that she was fabricating the abuse.

The judge here avoided replicating the error in Dwyer, 448 Mass. at 129-130. There, the Commonwealth presented two charged incidents and seven uncharged incidents. Id. at 127-128. (Unlike here, in Dwyer, all of the uncharged incidents preceded the charged conduct. Id.) The direct examination on the uncharged conduct there was forty per cent longer than on the charged conduct, and most of the cross-examination and "much" of the defendant's testimony was directed to the uncharged conduct. Id. at 128.

Here, by contrast, the bulk of the victim's testimony and all four Commonwealth exhibits concerned the charged conduct. A much smaller portion of the victim's testimony concerned the uncharged conduct. All of the victim's sister's testimony concerned the charged conduct, as she failed to answer questions about the uncharged conduct. None of the detective's testimony

---

[5] Defense counsel stated that her desire to use the victim's statements to the social workers was independent of the admission of the uncharged conduct.

concerned the uncharged conduct. Similarly, the defendant's testimony (on direct and cross-examination) was centered on the charged conduct, with a much lesser amount concerning the uncharged conduct.

This case favorably compares to cases in which uncharged conduct was permissibly admitted. In Commonwealth v. Facella, 478 Mass. 393, 403-404 (2017), the Commonwealth introduced prior attacks on two unrelated persons to rebut a defense that the charged attack was caused by medication. Like here, there were two specific incidents and a five-year course of general conduct. See id. at 403. But, unlike here, the victims in the uncharged conduct were different from the victim of the charged conduct. Id. Nonetheless, the Supreme Judicial Court found the admission of the evidence within the trial judge's discretion. Id. at 407-408.

In Commonwealth v. Robertson, 88 Mass. App. Ct. 52, 53 (2015), the defendant was charged with the rape of his son's eight year old half-sister. The Commonwealth introduced evidence that the defendant molested his own daughter for four to six years about ten years before the charged conduct to show a pattern of operation. Id. at 53-54, 55. The evidence there had a greater potential for prejudice than here, as the uncharged conduct was presented by the testimony of the defendant's own daughter, who was not the victim in the charged

conduct.  Id. at 55.  Nevertheless, we held that admission of the evidence was within the trial judge's discretion.  Id. at 54.

In Commonwealth v. Hanlon, 44 Mass. App. Ct. 810, 812 (1998), the defendant was charged with raping the victim in his cottage in Scituate.  Most of the defendant's abuse of the victim, however, occurred in a ski chalet in Vermont, and the victim testified about numerous sexual assaults there.  Id.  In addition, the Commonwealth presented evidence that the defendant abused four other persons in the ski chalet over the next ten years.  Id. at 812-813.  We held that admission of all of this evidence was within the judge's discretion to show a course of conduct.  Id. at 819-820.  Moreover, "[a]lthough the last witness claimed to have been abused . . . nine years after the last charged act, this testimony was not too remote, given the continuing nature of the pattern, and the striking similarity of each incident to the charged acts."  Id. at 820.  This case falls well within the parameters of Hanlon.

Furthermore, it is significant that "[t]he judge also provided a limiting instruction to the jury regarding the prior bad act evidence when it was offered and again in his final charge, thus minimizing any prejudicial effect."  Almeida, 479 Mass. at 569.  Accord Commonwealth v. Clayton (No. 1), 63 Mass. App. Ct. 608, 613 (2005).  The judge forcefully limited the

jury's use of the uncharged conduct to discerning "the relationship between the parties, the respective positions of the parties, any state of mind of the defendant or pattern of conduct or common scheme or course of conduct, absence of mistake or accident."  The judge provided this limiting instruction before the victim's testimony about the uncharged conduct, again after that testimony, and yet a third time in the final charge.  In sum, the judge acted within his discretion in his handling of the evidence of uncharged conduct.

b.  Closing argument.  So long as the prosecutor's closing argument is grounded in the evidence, the prosecutor may "argue 'the evidence and the fair inferences which can be drawn from the evidence.'"  Commonwealth v. Rivera, 91 Mass. App. Ct. 796, 801 (2017), quoting Commonwealth v. Braley, 449 Mass. 316, 329 (2007).  "Because the defendant did not object to the prosecutor's closing statement at trial, we review [any error] for a substantial risk of a miscarriage of justice."  Commonwealth v. Proia, 92 Mass. App. Ct. 824, 835 (2018).

In closing argument, the prosecutor argued that the defendant consistently molested the victim from the time she was six years old.  The prosecutor argued that all the incidents, charged and uncharged, were part of a pattern of the defendant's taking advantage of opportunities to molest the victim.  In short, the prosecutor used the uncharged conduct to argue that

it showed the relationship between the defendant and the victim was one of consistent sexual abuse.  This was one of the purposes for which the uncharged conduct was admitted.  Accordingly, the prosecutor acted properly in using the evidence for the purpose for which it was admitted.  See Commonwealth v. Philbrook, 475 Mass. 20, 28-29 (2016) (prosecutor's argument that defendant killed victim because he was angry was proper use of prior bad acts admitted to show hostility between defendant and victim); Commonwealth v. Baker, 67 Mass. App. Ct. 760, 769 (2006) (argument that prior bad acts showed that defendant committed charged crime was proper).

There is no doubt that, had the uncharged conduct been improperly admitted, the prosecutor's heavy use of it would establish the prejudicial nature of the error.  Because, however, the trial judge acted within his discretion in admitting the evidence of the uncharged conduct, there was no error.

Judgments affirmed.

SINGH, J. (dissenting).  I write separately because I believe that the court's decision fails to adhere to the guidance of the Supreme Judicial Court in Commonwealth v. Facella, 478 Mass. 393, 405-406 (2017), and Commonwealth v. Dwyer, 448 Mass. 122, 128-129 (2006),  respecting the admission of uncharged prior bad acts in criminal sexual assault cases. The uncharged criminal conduct introduced in this case overwhelmed the charged conduct and, together with closing argument, which blended the two, likely deprived the defendant of a fair trial.  In arriving at a contrary conclusion, I believe the court significantly underestimates the damage done by evidence of uncharged bad acts, particularly those that constitute the same crimes for which the defendant is on trial.

While our case law has developed in such a way as to allow bad acts to be admitted for various purposes, including to show "inclination" to commit the crime charged, it still aims to prohibit propensity evidence.  Commonwealth v. Hanlon, 44 Mass. App. Ct. 810, 818 n.5 (1998) (noting incongruence of law in this area).  If the exceptions are not to swallow the rule, they must be applied in a circumspect manner and with due regard for the risk of prejudice to the defendant.

The starting point must be that any bad act evidence that is collateral to the issue to be tried risks being highly prejudicial.  See Commonwealth v. Barrett, 418 Mass. 788, 795

(1994) ("It is implicit in the general rule regarding the inadmissibility of prior bad acts evidence that the admission of such evidence carries with it a high risk of prejudice to the defendant"); Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014) (because "other bad acts" evidence is "inherently prejudicial," more "exacting standard" of admissibility is necessary).  To this must be added the consideration that bad act evidence "is admitted not for the direct purpose of proving an element of the crime charged but merely as circumstantial evidence tending to establish, by inference, one factor relevant to the determination of guilt."  Barrett, 418 Mass. at 795. Against this backdrop, the probative value of the bad act evidence must be evaluated.  See Commonwealth v. Anestal, 463 Mass. 655, 665 (2012) (even if other bad act evidence is probative of relevant issue in case, it may not be admitted unless probative value outweighs risk of unfair prejudice).

In order to determine whether the proper balance was struck, it is important to clarify the purpose for which the Commonwealth offered the evidence and the basis upon which the trial judge admitted it.  See Facella, 478 Mass. at 404.  Here, the prosecutor explained that the purpose was the usual one: "to present an accurate picture of the relationship between the parties and the defendant's motive and intent for the charged

conduct."[1] The judge allowed the Commonwealth's motion, without articulating his reasoning, so it is natural to infer that he concurred with the Commonwealth's rationale and its theory.[2]

There is no question that, when a defendant is tried on sexual assault charges, "some evidence of uncharged conduct may be admissible to give the jury a view of the entire relationship between the defendant and the alleged victim, and 'the probative existence of the same passion or emotion at the time in issue.'" Dwyer, 448 Mass. at 128-129, quoting Barrett, 418 Mass. at 794. Compare Facella, 478 Mass. at 405. Some evidence, however, does not mean any or all evidence. See Dwyer, 448 Mass. at 129

---

[1] The prosecutor also explained "the reason that [the uncharged acts are] part of the case is quite simply because they happened out of county." The Commonwealth was not without the ability to prosecute the defendant for crimes against the same victim occurring in two different counties. See Dwyer, 448 Mass. at 126 n.5 (sexual assaults involving same defendant and victim in two different counties indicted separately and joined for trial). The fact that the other bad acts occurred out of county should not be a ground supporting admission.

[2] Although the Commonwealth sought to admit the bad acts in order to put the crimes into the context of the relationship, the prosecutor also sometimes referred to the bad acts as "course of conduct" evidence. There was nothing to suggest, however, a unique pattern underlying the specific incidents that would constitute a course of conduct. See, e.g., Commonwealth v. Walker, 442 Mass. 185, 201-203 (2004) (defendant engaged in series of criminal episodes; in each, he brought woman back to his home, drugged her with drink containing sleeping medication, and then sexually assaulted her); Hanlon, 44 Mass. App. Ct. at 818-821 (in trial of priest charged with sexually assaulting altar boy, other former altar boy witnesses permitted to testify to uncharged assaults against them, where each had similar relationship to defendant, assaults occurred in same location, and manner in which defendant approached each was similar).

(allowing victim "to testify in detail about each of seven uncharged incidents was excessive").

Nor does our common-law rule contemplate that uncharged bad act evidence be fully recited by the victim at trial, if for no other reason than a detailed narrative is likely to confuse the facts and the issues to be decided by the jury, and to create a risk of undue prejudice to the accused. See Commonwealth v. Stone, 321 Mass. 471, 473 (1947) (bad act evidence creates risk that jury may see defendant as someone capable of and likely to commit crime charged and dispense with proof that he actually did commit crime charged). See also Commonwealth v. Trapp, 396 Mass. 202, 206 (1985).

Here, the prosecutor indicated that the bad act evidence would be presented "in fairly summary fashion so that they don't overwhelm the trial." Yet, the Commonwealth's motion in limine sought to present evidence of several specific instances of uncharged bad acts taking place in the seven years between the charged acts. The judge allowed the motion in its entirety. Later, during the course of trial, the judge limited the evidence somewhat, but still allowed the victim to testify to details of uncharged sexual assaults, some of which were more inflammatory than the charged assaults. Given the purpose of the bad acts evidence -- to present a fair picture of the relationship between the parties -- it was unnecessary to go

into the details of the specific incidents.[3]  See Anestal, 463 Mass. at 666 (fact of department of social services complaint against defendant was probative, details were not).  Rather, where there was no other purpose for bringing up specific incidents, the nature of the relationship should have been explained in a summary manner.  See Dwyer, 448 Mass. at 130 (court cautioned trial judge on remand "to limit any prior bad act testimony to establishing in summary fashion that the [victim] claims that the abuse continued over a number of years").  Contrast Facella, 478 Mass. at 404-405 (specific incidents of defendant's violent attacks prior to interferon treatment admitted where relevant to specific purpose of rebutting defendant's claim that interferon diminished his capacity to commit murder).

The detailed nature of the uncharged incidents naturally led to cross-examination on those allegations and, when the defendant testified, to direct examination attempting to rebut those allegations and further cross-examination.  Thus, the

---

[3] Although the Commonwealth need not demonstrate that bad act evidence is necessary to its case, see Commonwealth v. Copney, 468 Mass. 405, 413 (2014), the fact that it is unnecessary certainly enters into the calculus whether the evidence is more probative than prejudicial.  See Mass. G. Evid. § 404(b)(2) (2018) (admissibility of bad acts evidence dependent on probative value outweighing risk of unfair prejudice to defendant).  In my view, it is unnecessary to admit evidence of specific incidents of bad acts simply to give context regarding the relationship between the parties, where that purpose may be served by a summary explanation.

jury's focus "was repeatedly drawn to the uncharged conduct." Dwyer, 448 Mass. at 129. Contrast Commonwealth v. King, 387 Mass. 464, 469 (1982) (after other bad acts evidence introduced, there was no further testimony concerning that evidence, and it was not alluded to in closing argument or judge's charge). See Mass. G. Evid. § 404(b) note, at 56 (2018) ("The prohibition against propensity evidence in specific act form stems from the belief that not only does such evidence have low probative value and carry the distinct risk of undue prejudice, it will also inevitably lead to proliferation of issues and distract the attention of the fact finder from the main event").

Moreover, the uncharged acts constituted the same crimes for which the defendant was being tried. The risk that the jury would infer guilt of the specific charged crimes in 2006 and 2011 from evidence that the defendant repeatedly committed the same crimes during the seven-year interim was too great to overlook. See Commonwealth v. Leftwich, 430 Mass. 865, 869 (2000) (substantial similarity of prior conviction to charge being tried weighs in favor of exclusion); Commonwealth v. Little, 453 Mass. 766, 773-774 (2009) (admission of defendant's prior conviction of crime substantially similar to one for which

he was being tried created risk that jury would convict based on propensity).[4]

This risk became more evident when, in closing argument, the prosecutor reviewed the uncharged conduct in conjunction with the charged conduct. The argument began: "In 2006 and 2011, and a bunch of times in between, this defendant took his opportunities when and where he found them." The theme continued: the opportunity the defendant saw in 2011 was "an opportunity not unlike the ones he'd been taking for years, since [the victim] was six." The prosecutor went on to detail the victim's account of each of the acts, charged as well as uncharged, and to attack the defendant's account of the same. Although the statements were undoubtedly grounded in the evidence at trial, they nevertheless communicated to the jury that the defendant had committed the crimes charged on numerous occasions over a seven-year period of time.

Limiting instructions notwithstanding,[5] I believe the prejudice flowing from the detailed accounts of uncharged bad

---

[4] While cases regarding prejudice resulting from the admission of prior criminal convictions may be distinguished, firsthand testimony from the victim of a crime relating the experience of being victimized is arguably more prejudicial than the admission of a record of a conviction, which may not be further explained. See Commonwealth v. McGeoghean, 412 Mass. 839, 843 (1992).

[5] Although I am cognizant of the presumption that jurors follow limiting instructions, "where the evidence subject to

acts, consisting of the same offenses for which the defendant stood charged, in conjunction with closing argument that emphasized the same, likely deprived the defendant of a fair trial.  I therefore respectfully dissent.

---

limitations has an extremely high potential for unfair prejudice, we have a duty to be skeptical as to the effectiveness of limiting instructions" (citation omitted). Commonwealth v. Elliot, 393 Mass. 824, 834 (1985).